# Joseph Ladley, Appellant, *v.* United States Express Company.

*Vendor and vendee—Conditional sale—Bailment.*

Where a person receives horses under an agreement purporting to be a lease and under which he agrees to pay for their use, such amount so paid to be credited as so much paid towards the purchase of the said horses and where the vendor virtually admits in his testimony that the installments of rent were really purchase money, such conditions disclose a conditional sale and not a bailment.

*Vendor and vendee—Rescission of contract—Question for jury.*

Where there is evidence tending to show that there has been a breach under a conditional sale and the vendor has retaken his goods prior to the service of an attachment execution against the vendee the question was for the jury, as the vendor was entitled to succeed if these facts were established and so found by the jury.

*Practice Superior Court—Assignments of Error.*

An assignment of error is defective and offends against Rule XV. which assigns error as follows "in refusing to charge the jury as requested by plaintiff in all his points."

Argued Oct 5, 1896.   Appeal, No. 43, Nov. T., 1895, by plaintiff, from judgment of C. P. No. 2, Phila. Co., March T., 1893, No. 176, on verdict for defendant.   Before RICE, P. J., WILLARD, WICKHAM, BEAVER, REEDER, ORLADY and SMITH, JJ. Reversed.

Sheriff's interpleader to determine title to certain horses.

Joseph Ladley transferred possession of certain horses to George Cramer under an agreement in writing which is as follows:

"Articles of agreement made and concluded this Fifteenth day of October, 1892, between Joseph Ladley, of Germantown, Philadelphia, Pennsylvania, of the first part, and George Cramer, of the same place, of the other part, *witnesseth,* that the said party of the first part hath demised, leased and to farm let, unto the said party of the second part, four horses, described as follows:—One dapple gray horse ten years old, 16 hands high; one dark gray horse about ten years old, 16 hands high; one bay mare about seven years old, about 15½ hands high, and one black horse about six years old, and about 16 hands high, for the term of five months from the date hereof, fully to be complete and ended, at the rate of seventy-five dollars for the first month, and one hundred dollars for each month thereafter to the end of the term.

"And the said party of the second part leases said horses and agrees to pay said Ladley rent of four hundred and seventy-five dollars, at the days and times herein stipulated for the payment thereof, and to deliver up peaceable possession of the same at the expiration of said term in as good condition as they now are, reasonable wear and tear excepted, and the said rent is to be paid in the portions stated, on the fifteenth day of each and every month, and when the sum of $475 is paid, at or by the end of the said term, then the amount paid as rent shall be credited to the said George Cramer as so much paid towards the purchase of said horses.   And said party of the second part

further agrees not to assign this Agreement, or sub-let or under-lease the said horses or any part thereof.

" And said party of the second part further agrees that upon breach of any condition of this Agreement, upon five days' notice in writing for that purpose, to be given by the said party of the first part, he will quit and give up peaceable possession of said horses to said party of the first part, any law, usage or custom of the State of Pennsylvania, requiring longer notice, to the contrary notwithstanding.

" And said party of the second part hereby authorizes and empowers any attorney of any court of record in Pennsylvania, upon such breach of any condition hereof, to appear for him, the said party of the second part, in an action and therein confess a judgment, and authorizes the immediate issuing of *Fi. Fa.* for costs and debt, without asking leave of the court, and waiving all laws of said State of Pennsylvania exempting property from levy and sale on execution or distress for rent.

" In witness whereof the said parties have hereunto set their hands and seals the day and year first above written.

" JOSEPH LADLEY,      [L. S.]

" G. H. CRAMER.      [L. S.]

" Sealed and delivered in the presence of H. W. Amerling.

" Witness, OSWALD M. BOYER."

Cramer paid certain of the installments called for by the agreement, but on the 15th of January, 1893, failed to make the monthly payment covered by said agreement and from that time on a breach continued until the 7th of February, 1893, when Ladley served the written notice on Cramer by leaving it with his wife at his home and by virtue of the terms of the agreement took into his own possession the property. Some days after Ladley as is alleged had taken the horses into his own possession, the United States Express Company by writ of attachment issued against Cramer seized the horses of Ladley for claims alleged to be due the company from Cramer. The affidavit for the attachment was filed February 18, 1893. Under cross-examination Joseph Ladley on the stand testified as follows:

" Q. He was to pay the whole price of them in three or four months? A. That is the way I got the agreement wrote. Mr. Cramer in the first place wanted to buy them, and he had noth-

152 LADLEY, Appellant, *v.* UNITED STATES EXPRESS CO.

Statement of Facts—Opinion of the Court below. [3 Pa. Superior Ct.

ing to pay me with, or nothing to give me, and Mr. Boyer said I had better go back and see Mr. Amerling. Q. What did you and Mr. Cramer do? A. I thought I had such a strict agreement that he wouldn't sign it. Q. The rent in the agreement was the prices of the horses. A. I thought he couldn't make out that long. Q. What was the price he was to pay for the horses?"

Objected to.

By the Court: The objection is overruled.

By Mr. Freeman: " Q. What was the price Cramer was to pay for these horses at the time he got them? A. Well, $475, I guess. Q. That was the whole price of the horses that Cramer was to pay? A. Yes, sir. Q. He was to pay on account of that price how much the first month? A. $75.00. Q. And during the other four months was he to pay, $100 a month? A. Yes, sir. Q. And at the end of the four months, if he paid the price, the horses were to be his? A. Yes, sir. Q. Then you expected to get at the end of the five months the full value of the horses? A. Yes, sir. Q. And in that way you fixed the price, which was called ' rental' in the lease? A. Yes, sir."

The court below charged the jury as follows:

In this cause, the horses which are in suit were seized as the property of a man named Cramer. The claimant then came forward and said that they did not belong to Cramer, but were his property, and that is the issue which is to be determined in this cause—as to whether or not the horses in question are the property of the claimant.

It seems that at one time the claimant owned the four horses. Now, a man who was in that possession might make a contract for hiring the horses if he chooses to do so and can find somebody to hire them to, or he may make a contract of sale if he can find a purchaser, but he cannot do both of those two things at the same time.

That was the effort which apparently was made in this cause, and somebody has taken a lease, applicable in its terms to real estate, but entirely unsuited to a contract for horses, and has filled into that lease in the blanks what purports to be an agreement. As would naturally result under such circumstances, we have a sort of legal monstrosity, but, such as it is,

we must endeavor to get at what is the meaning of the parties, and that, it seems to me, under the testimony as it has been presented here, is entirely a question of law for the court to determine.

The provisions here inserted into the lease with respect to real estate (because there is no such thing as the rental of horses), provide that certain monthly payments shall be made, [but if a man were hiring horses it would naturally be expected that there would be some arrangement for the care of the horses,—some arrangement for the kind of work to be done by them, and then some provision for the return of them when the time is over.] [3]

[This paper contains no such provisions, but it does contain a provision that the "amount shall be credited to the said George Cramer as so much paid towards the purchase of said horses." There is nothing said in the paper itself as to any purchase, so that that would be incomprehensible, although it seems to indicate the thought in the minds of the parties that there was to be a purchase, were it not for the statement of the plaintiff who has very frankly told us that he was to be paid $475.] [4]

My construction of this agreement or paper (or whatever it may be) is, that it was intended between the parties to constitute a sale. I therefore instruct you that your verdict in this case ought to be for the defendant.

I will give an exception to the plaintiff.

Verdict for defendant. Claimant appealed.

*Errors assigned* were, (1) withdrawing the case from the jury and instructing them to find for the defendant; (2) in refusing to charge the jury as requested by the plaintiff in all his points submitted to the court; (3, 4) portions of the judge's charge, reciting same.

*H. Wharton Amerling*, with him *Harmon B. Amerling* for appellant.

*J. S. Freemann*, with him *John F. Keator* and *Owen B. Jenkins*, for appellee.

OPINION BY WICKHAM, J., December 7, 1896 :

Taking the written contract between the appellant and George H. Cramer, in connection with the testimony of the former to

the effect that he had sold the horses mentioned in the contract to Cramer, we agree with the learned judge of the court below that the arrangement whereby Cramer got and held the horses in dispute was a conditional sale, rather than a bailment; and if there were nothing more in the case, we would have to affirm the judgment.

The evidence, as printed and submitted to us, is somewhat confused and confusing; but we are satisfied, after a careful examination thereof, that enough appeared at the trial to make it the duty of the learned judge to submit to the jury the question whether the appellant, taking advantage of a breach by Cramer of a condition of the contract between them, had not repossessed himself of the horses before the service of the attachment issued by the appellee company against Cramer. There is evidence (see testimony of Samuel Ladley) that, before the attachment was executed, the agent of the express company, who had charge of the legal proceedings, directed the appellant to take his horses home; that the latter did so and, later, hired them to the express company, after which they were attached by the company for Cramer's debt. If these are the facts, and the jury had so found, then the appellant was entitled to succeed. This branch of the case, however, was entirely ignored or overlooked by the learned trial judge.

The first assignment of error, so far, and only so far, as it relates to the binding instruction to the jury to find for the defendant, is sustained. No exception was taken to the alleged refusal of the court below to hear the appellant's counsel. The second assignment is not considered. It offends against rule 15 of this court, which provides that " Every error relied on must be assigned particularly and by itself. If any assignment of error embrace more than one point, or refer to more than one bill of exception, or raise more than one distinct question, it shall be considered a waiver of all the errors assigned."

The view we take of the transaction between Ladley and Cramer, namely, that under all the evidence it was not a bailment, but a conditional sale, makes it unnecessary to pass directly on the other assignments of error.

Judgment reversed and venire facias de novo awarded.